Slip Op. 15-84

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                             :

CHANGZHOU TRINA SOLAR        :
ENERGY CO., LTD., TRINA SOLAR  :
(U.S.) INC., WUXI SUNTECH POWER  :
CO., LTD., SUNTECH AMERICA, INC.,  :
SUNTECH ARIZONA, INC., YINGLI   :
GREEN ENERGY HOLDING COMPANY :
LIMITED, and YINGLI GREEN       :
ENERGY AMERICAS, INC.,          :
                                             :

          Plaintiffs,           :     Before: Richard K. Eaton, Judge
                                             :
              v.                :     Court No. 13-00014
                                             :

UNITED STATES INTERNATIONAL   :
TRADE COMMISSION,           :
                                           :

          Defendant,          :     **PUBLIC VERSION**
                                           :
             and               :
                                           :

SOLARWORLD AMERICAS INC.,    :
                                           :
          Defendant-Intervenor.     :
_____:

**OPINION**

[United States International Trade Commission's Final Determination is sustained.]

Dated: August 7, 2015

    *Neil R. Ellis* and *Rajib Pal*, Sidley Austin LLP, of Washington, DC, argued for plaintiffs. With them on the brief were *Richard Weiner*, *Brenda A. Jacobs*, *Lawrence R. Walders*, and *Raphaelle E. Monty*.

    *Mary Jane Alves*, Attorney-Advisor, Office of General Counsel, United States International Trade Commission, of Washington, DC, argued for defendant. With her on the brief were *Dominic L. Bianchi*, General Counsel, and *Neal J. Reynolds*, Assistant General Counsel for Litigation.

*Timothy C. Brightbill*, Wiley Rein LLP, of Washington, DC, argued for defendant-intervenor.

EATON, Judge: Before the court is the motion for judgment on the agency record of plaintiffs Changzhou Trina Solar Energy Co., Ltd., Trina Solar (U.S.) Inc., Wuxi Suntech Power Co., Ltd., Suntech America, Inc., Suntech Arizona, Inc. ("Suntech Arizona"), Yingli Green Energy Holding Company Limited, and Yingli Green Energy Americas, Inc. (collectively, "plaintiffs") made pursuant to USCIT Rule 56.2.  *See* Mot. for J. on the Agency R. (ECF Dkt. No. 31).  By their motion, plaintiffs contest the final affirmative material injury determination of the United States International Trade Commission ("ITC" or the "Commission") in the antidumping and countervailing duty investigations concerning crystalline silicon photovoltaic ("CSPV") cells and modules from China.  *See* Crystalline Silicon Photovoltaic Cells and Modules From China (Final), USITC Pub. 4360, Inv. Nos. 701-TA-481 and 731-TA-1190 (Nov. 2012) (ECF Dkt. No. 20-1) ("Final Determination"); Crystalline Silicon Photovoltaic Cells and Modules From China, 77 Fed. Reg. 72,884 (ITC Dec. 6, 2012).  Defendant, the ITC, opposes plaintiffs' motion and asks that its Final Determination be sustained.  *See* Def. International Trade Commission's Opp'n to Pls.' Mot. for J. on the Agency R. 1 (ECF Dkt. No. 35). Defendant-intervenor, SolarWorld Americas Inc. ("defendant-intervenor" or "SolarWorld"), a domestic manufacturer of solar cells and modules, joins in opposition to plaintiffs' motion.  *See* Def.-int. SolarWorld's Resp. to Pls.' Rule 56.2 Mot for J. on the Agency R. and Accompanying Mem. of P. & A. in Supp. 1–3 (ECF Dkt. No. 38).  Jurisdiction lies pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(i).  For the reasons that follow, the ITC's Final Determination is sustained.

# BACKGROUND

In October 2011, defendant-intervenor SolarWorld filed antidumping and countervailing

duty petitions with the United States Department of Commerce ("Commerce" or the

"Department") and the ITC covering imports of CSPV cells and modules from China.[1]

Crystalline Silicon Photovoltaic Cells and Modules From China, 76 Fed. Reg. 66,748, 66,748–49

(ITC Oct. 27, 2011) (institution of antidumping and countervailing duty investigations and

scheduling of preliminary phase investigations).  The period of investigation was January 2009

through June 2012 ("POI").  In October 2012, following its investigations, the Department

determined that imports from China were both being subsidized by the Chinese government and

sold in the United States at less than fair value.  Subsequently, in November 2012, following its

own investigations, the ITC issued its Final Determination, whereby it determined that the CSPV

industry in the United States was being materially injured by reason of imports of subject

merchandise.  Final Determination, 77 Fed. Reg. at 72,884.

During the preliminary investigations, the Chinese Chamber of Commerce for Import and

Export of Machinery and Electronic Products (the "Chinese Chamber"), an association of

Chinese producers and exporters, and related U.S. importers of subject merchandise that opposed

the petition, urged the ITC to define the domestic like product more broadly than was ultimately

---

[1]     "CSPV cells typically measure 5 by 5 inches or 6 by 6 inches, have an output of 3
to 4.5 watts, and . . . use either monocrystalline silicon or multicrystalline silicon to convert
sunlight into electricity."  Final Determination at 6.  These cells are strung together, sealed,
laminated, and framed to produce CSPV modules, also known as solar panels.  See Final
Determination at 6–7.  "CSPV modules are the main component of solar CSPV systems that use
crystalline silicon to convert sunlight into electricity either for on-site use or for distribution
through the electric grid."  Final Determination at 7.  "CSPV modules may be used in on- and
off-grid applications for residential, non-residential, and utility purposes in ground- or roof-
mounted systems."  Final Determination at 7.  CSPV products are manufactured "from refined
polysilicon that is formed into ingots, sliced into wafers, converted into cells, and then assembled
into modules."  Final Determination at 12.

the case in the Final Determination.  *See* Views of the Commission (Preliminary) at 9, CD 136 at

Doc. No. 466545 (Dec. 13, 2011), ECF Dkt. No. 67-1 ("Preliminary Determination").

Specifically, the Chinese Chamber argued that the scope should include thin-film photovoltaic

products ("thin-film products") in the definition of the domestic like product.  Preliminary

Determination at 9.  At the conclusion of its investigations, however, the Commission excluded

thin-film products from the scope of the domestic like product.  Final Determination at 9.

In its Final Determination, the ITC also found that plaintiff Suntech Arizona should be

excluded from the domestic industry as a related party because its interests rested primarily with

importing CSPV products rather than their domestic production.  Final Determination at 19, 22.

As a result, the Commission defined the domestic industry of subject merchandise to include "all

U.S. producers of CSPV cells and modules, except for Suntech [Arizona]."  Final Determination

at 24.

Also, during the course of the investigations, plaintiffs claimed that the ITC should take

into account certain unique aspects of the CSPV marketplace before making its injury

determination.  *See, e.g.*, Post-Hearing Br. of China Chamber of Commerce for Import and

Export of Machinery and Electronic Products (Volume I of II) at 4–14, CD 419 at Doc. No.

493162 (Oct. 11, 2012), ECF Dkt. No. 67-3.  As shall be seen, the Commission takes the position

that it took into account market conditions, as required by law.

In the end, in the Final Determination, the Commission issued its affirmative material

injury determination, finding that the domestic industry was "'materially injured by reason of'

unfairly traded imports."  Final Determination at 25.

## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.   LEGAL FRAMEWORK

"Under the unfair trade laws, Commerce determines whether foreign imports into the United States are either being dumped or subsidized (or both).  It is for the ITC to determine whether these dumped or subsidized imports are causing material injury to a domestic industry in the United States."  *Navneet Publ'ns (India) Ltd. v. United States*, 32 CIT 169, 171 (2008) (citing 19 U.S.C. §§ 1673(1), (2), 1671(a)(1), (2)).

Although Commerce determines the "class or kind of foreign merchandise [that] is being, or is likely to be, sold in the United States at less than its fair value" or has been subsidized, "the ITC is responsible for identifying the corresponding universe of items produced in the United States that are like[,] or in the absence of like, most similar in characteristics and uses with the items in the scope of the investigation."  *See* 19 U.S.C. § 1673(i); 19 U.S.C. § 1671(a); *Int'l Imaging Materials, Inc. v. U.S. Int'l Trade Comm'n*, 30 CIT 1181, 1183 (2006) (alteration in original) (citation omitted) (internal quotation marks omitted) (citing 19 U.S.C. § 1677(10)).  Thus, the ITC begins a material injury investigation by "determin[ing] the scope of the 'domestic industry' by defining the 'domestic like product' under investigation."  *Cleo Inc. v. United States*, 30 CIT 1380, 1382–83 (2006) (citing 19 U.S.C. § 1677(4)(A)), *aff'd*, 501 F.3d 1291 (Fed. Cir. 2007); *see also Int'l Imaging*, 30 CIT at 1183.

Under certain conditions, the Commission's decision as to the companies that make up the domestic industry is guided by 19 U.S.C. § 1677(4)(B)(i).  This subsection provides, in relevant part, "[i]f a producer of a domestic like product and an exporter or importer of the subject merchandise are related parties, or if a producer of the domestic like product is also an importer of the subject merchandise, the producer may, in appropriate circumstances, be excluded from the industry."  19 U.S.C. § 1677(4)(B)(i); *see also Allied Mineral Prods., Inc. v. United States*, 28 CIT 1861, 1863 (2004).

Following the Commission's determination as to what constitutes the domestic like product and its determination as to which companies qualify as members of the domestic industry, "it must next examine the volume of imports, their effect on prices for the domestic like product, and their impact on domestic producers of the domestic like product."  *Int'l Imaging*, 30 CIT at 1183 (citation omitted) (internal quotation marks omitted) (citing 19 U.S.C. § 1677(7)(B)(i)(I)–(III)).  As part of its analysis, "[t]he Commission may also consider 'such other economic factors as are relevant in the determination.'"  *JMC Steel Grp. v. United States*, 38 CIT __, __, Slip Op. 14-120, at 8 (2014) (quoting *Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1210, 431 F. Supp. 2d 1302, 1306 (2006)); *see also* 19 U.S.C. § 1677(7)(B)(ii).  Upon completion of this analysis, should the ITC make a final affirmative material injury determination, and Commerce make an affirmative determination with respect to countervailing duties or dumping, an order will result.

## II.   THE COMMISSION'S DOMESTIC LIKE PRODUCT ANALYSIS IS SUPPORTED BY SUBSTANTIAL EVIDENCE

As part of its investigations, the Commission sought to define the domestic like product in order to determine whether a domestic industry was materially injured as a result of subject

imports.  Here, the Commission's domestic like product analysis balanced the six factors[2]

typically used to determine whether a specific product should be included within the scope of the

Commission's investigation.  Upon completing this analysis, the Commission determined that

thin-film products fell outside the scope of the domestic like product.  Final Determination at 16.

"The 'like product' determination is a factual issue that the Commission resolves by weighing

six factors relating to the products in question."  *Cleo Inc. v. United States*, 501 F.3d 1291, 1295

(Fed. Cir. 2007).  Therefore, in order to establish the facts, the Commission relied, in part, on

information obtained from a survey it conducted of domestic producers, importers, and

purchasers of CSPV products regarding perceived similarities between the products based on

each of the six factors.

Plaintiffs argue that the Commission's Final Determination, which excluded thin-film

products from the scope of the domestic like product, was not supported by substantial evidence

because thin-film products are sufficiently similar to the subject merchandise to be included

within the scope for purposes of 19 U.S.C. § 1677(10).  Mem. of P. & A. in Supp. of Mot. for J.

on the Agency R. 7 (ECF Dkt. No. 31) ("Pls.' Br.").  Plaintiffs claim that "the Commission

erroneously focused on small technical distinctions that obscured the fundamental similarities

between the two solar technologies."  Pls.' Br. 7.  Specifically, they point to evidence that

indicates that CSPV and thin-film modules are made of glass, can be used in solar shingles, and

compete with each other.  *See* Pls.' Br. 38–39.  They also note, in support of their argument, that

---

[2]       As shall be seen, the ITC used its ordinary methodology, in which it weighed six
factors as part of its evaluation of whether thin-film products should be included within the scope
of the domestic like product: "(1) physical characteristics and uses; (2) common manufacturing
facilities and production employees; (3) interchangeability; (4) customer perceptions; (5)
channels of distribution; and, where appropriate, (6) price."  *See Cleo Inc. v. United States*, 501
F.3d 1291, 1295 (Fed. Cir. 2007) (citations omitted); Final Determination at 9–16.

twelve of nineteen United States producers and thirty-four of forty-nine importers polled by the

ITC reported that the two products share the same channels of distribution.  Pls.' Br. 39.

Therefore, for plaintiffs, the ITC's analysis makes clear that it found similarities in each of the six

factors that it is directed to use in making its "like product" determination, except for

"manufacturing facilities."  Pls.' Br. 7.  As such, plaintiffs reason that, despite the Commission's

finding that the products differed in several respects, the similarities between them rendered it

impossible to find any clear dividing line between the two.  Pls.' Br. 7.

The court finds plaintiffs' arguments unconvincing and thus holds that the ITC's

determination to exclude thin-film products from the scope of the domestic like product is

supported by substantial evidence.  In doing so, the court has reviewed the methodology

employed by the ITC and the record evidence it considered.

As noted, the ITC normally resolves its "like product" determination "by weighing six

factors relating to the products in question: (1) physical characteristics and uses; (2) common

manufacturing facilities and production employees; (3) interchangeability; (4) customer

perceptions; (5) channels of distribution; and, where appropriate, (6) price."  *Cleo*, 501 F.3d at

1295 (citations omitted).  No single factor is dispositive and the Commission is permitted to

consider other relevant factors.  *Cleo*, 30 CIT at 1384 & n.5 (citing S. REP. NO. 96-249, at 90–91

(1979), *reprinted in* 1979 U.S.C.C.A.N. at 476–77).  "When weighing those factors, the

Commission disregards minor differences [between the products] and focuses on whether there

are any clear dividing lines between the products being examined."  *Cleo*, 501 F.3d at 1295

(citing *Nippon Steel Corp. v. United States*, 19 CIT 450, 455 (1995)).

### A.  Physical Characteristics, Uses, and Interchangeability

As an initial matter, the court notes that the "physical characteristics and uses" and "interchangeability" factors are particularly relevant to the ITC's domestic like product determination, where, as here, these products' primary use is to create electricity.  The respective capacities of CSPV cells and modules and thin-film products to produce electricity are naturally significant for determining whether the products are sufficiently similar to one another for thin-film products to be included within the scope of the investigations.

In its Final Determination, the Commission found a variety of important differences between the two products' physical characteristics, uses, and interchangeability, such as differences in physical length, thickness, and rigidity of CSPV and thin-film products.  *See* Final Determination at 9–11, 14–15.  While plaintiffs maintain that the differences are insignificant, these variations create substantially different capabilities of CSPV and thin-film products. Indeed, eleven of nineteen U.S. producers of CSPV and/or thin-film products and twenty-seven of forty-nine importers that responded to the ITC's questionnaires stated that the two products were not interchangeable.  Final Determination at 14.  For example, the ITC found that thin-film products possess different balance of system[3] requirements, lower conversion efficiency, and lower wattage output than CSPV products and thus that more thin-film modules than CSPV modules are needed in order to produce the same amount of electricity.  *See* Final Determination at 10, 14.

---

[3]        The "balance of system" is used to refer to "[t]he other components of solar CSPV system installations," which "are items such as the inverter and the racking on which the system is installed as well as the labor costs, permitting fees, and other expenses associated with installing a photovoltaic . . . system."  Final Determination at 7.  In other words, the "balance of system" refers to the other materials that go into the installation of the merchandise.  In addition to module costs, installers consider balance-of-system costs of the racking on which the systems are installed.

The Commission also found "significant differences in physical characteristics and capabilities between CSPV and thin-film products . . . related to differences in their underlying raw materials and production processes." Final Determination at 9. It observed that on-grid CSPV modules typically "consist of a 34- to 62-pound framed glass laminate that measures 62 to 78 inches long, 32 to 39 inches wide, and 1.2 to 2 inches thick and that is comprised of 60 to 72 cells," and "[o]ff-grid CSPV modules are often smaller." Final Determination at 9–10. On the other hand, the ITC found that "[t]hin-film modules consist of a glass or flexible substrate such as stainless steel or plastic with a surface layer of amorphous silicon ('a-Si'), cadmium telluride ('CdTe'), and/or copper indium (gallium) (di)selenide ('CIGS') . . ." and are generally smaller in dimension, thinner, and tend to weigh less. Final Determination at 10. Thus, it concluded that "the variety of substrates used to make thin-film modules provides more flexibility and a broader range of possible sizes, including some that are considerably longer than on-grid CSPV modules." Final Determination at 10. Overall, the ITC found that "thin-film products tend to have a considerably lower conversion rate, despite the fact that thin-film products are able to generate power in low-light conditions." Final Determination at 10. Indeed these findings were consistent with the questionnaire responses received from U.S. producers and importers, which "pointed to thin-film products' thinness and lighter weight, the fact that CSPV modules are silicon-based whereas thin-film products are chemical-based, . . . differences between the two products in terms of sizes, proportion, voltage, conversion efficiency, and quality," and that "CSPV modules tend to be framed whereas thin-film modules tend to be frameless," as important differences. Final Determination at 11.

As a result of these physical differences and varying capabilities, thin-film products require a greater surface area of exposure to generate the same amount of electricity as CSPV

modules.  Final Determination at 14 ("Moreover, due to their lower conversion efficiencies and

lower wattage output, thin-film products need more surface area to generate the same energy as

CSPV modules, making thin-film products somewhat more attractive for projects in

environments with high temperatures and significant amounts of sunlight.").  Hence, the ITC

found that physical characteristics and capabilities make thin-film products naturally more

attractive for projects where there are fewer space constraints, higher temperatures, and

significant amounts of sunlight, whereas CSPV products are better-suited for larger, standalone

projects.  *See* Final Determination at 11, 14.

Thus, the Commission found that CSPV modules are more attractive for "projects in the

eastern United States, where land is more expensive and less available."  Final Determination at

14–15.  In addition, through the questionnaires, it was reported that CSPV products are more

commonly used in residential and non-residential rooftops than thin-film products, and that thin-

film products produce insufficient power for use in residential applications.  *See* Final

Determination at 14 n.82.  Thus, it is hard to argue with the Commission's conclusion that thin-

film products "may be more suitable for utility as opposed to residential and smaller non-

residential applications, except for those projects needing a lighter product for mounting on a

lower-strength roof or a more flexible product."  Final Determination at 14.  Therefore, although

both products are used to make electricity, the ITC supported with substantial evidence its

conclusions that, while there is some overlap, each is particularly suited for different

applications.

Accordingly, the ITC reasonably determined, based on record evidence, that the two

products do not share similar physical characteristics and end uses.  Indeed, the Commission

found that the products' respective capacities to produce electricity were not comparable, and

thus that both products were not consistently interchangeable for one another, thereby favoring

exclusion of thin-film products from the scope of the domestic like product.

### B. Common Manufacturing Facilities, Production Processes, and Production Employees

The ITC also found that there was little or no overlap in the manufacturing facilities,

production processes, or employees used to manufacture thin-film and CSPV products.  Final

Determination at 11.  Out of nineteen domestic "producers of CSPV and/or thin film products,

eighteen reported that the production process of thin film solar products differed from that of

CSPV cells and modules."  Crystalline Silicon Photovoltaic Cells and Modules from China, Staff

Report to the Commission on Inv. Nos. 701-TA-481 and 731-TA-1190 (Final) (Oct. 25, 2012) at

I-36 (ECF Dkt. No. 20-2) ("Final Staff Report").  Additionally, "[o]f the forty-nine responding

U.S. importers, thirty-seven reported that the production processes between the two product

types differed substantially."[4]  Final Staff Report at I-36.

The Commission further observed that

CSPV products are made from refined polysilicon that is formed into ingots, sliced into wafers, converted into cells, and then assembled into modules.  The cells in CSPV modules use either mono- or multi-crystalline silicon; when sunlight hits the modules, it knocks loose electrons that flow into the cells' thin metal "fingers" and conduct electricity to the busbars.  The CSPV cells are soldered together in strings and arranged in a rectangular matrix, sealed with an EVA sheet, joined to a back sheet, laminated, framed, and then mounted to a junction box.  In contrast, manufacturers generally make thin-film products by

---

[4]       Further, the ITC noted that only one questionnaire respondent, [[
          ]], reported producing both CSPV and thin-film products, but even that respondent
reported that "[[
                                                                                        ]]."  Final Determination
at 12.

applying a layer of photosensitive material such as a-Si, CdTe, and/or CIGS to glass or to a flexible substrate such as stainless steel or plastic.

Final Determination at 12.

Based on the questionnaire responses and the clear differences in how they are manufactured, it is evident that the ITC reasonably reached the conclusion that thin-film and CSPV products do not overlap in manufacturing facilities, production processes, or employees. It is worth noting that plaintiffs do not dispute this finding, which tends to support the conclusion that CSPV cells and modules and thin-film products are not like products.

### C.  Customer Perceptions

Consistent with its findings related to physical characteristics, uses, and interchangeability, the Commission also found that consumers and producers perceive CSPV and thin-film modules as different products.  Eleven of nineteen U.S. producers of CSPV and/or thin-film products and twenty-three of forty-nine importers that responded to the Commission's questionnaires, "reported that their customers perceive the products to have different physical characteristics, flexibility, efficiency, power outage, space requirements, bankability, environmental concerns, climate suitability, performance characteristics, reliability, durability, and established nature."  Final Determination at 15.

In addition, it was reported to the ITC that, although thin-film is less expensive per watt than CSPV modules, it does not produce enough power for residential applications, whereas CSPV modules are commonly used for residential purposes.  *See* Final Staff Report at II-23. Also, although a number of purchasers reported that they considered both CSPV and thin-film products for the same project, "many reported that they considered either CSPV or thin-film products but not both."  *See* Final Determination at 15.  For example, twenty-three of fifty-two

responding purchasers reported evaluating only one of the two products for the same end use or

project.  *See* Final Staff Report at II-23.  Thus, the ITC found that customers and producers

perceive important and significant differences between CSPV and thin-film products, thereby

supporting the Commission's exclusion of thin-film products from the scope of the domestic like

product.

Plaintiffs maintain that the questionnaire responses indicate "that almost half of U.S.

producers and a majority of importers did not agree that there were differences between the two

technologies in these areas," and thus that this factor favored the inclusion of thin-film products

as part of the scope of the domestic like product.  *See* Pls.' Br. 39 n.10.  At best, however, the

questionnaire responses show that there is no clear consensus among consumers as to these

products' interchangeability, and thus this evidence does not aid plaintiffs' case.  Indeed, this

disagreement among consumers and purchasers as to the substitutability of thin-film and CSPV

products actually lends support to the ITC's determination that the products are not sufficiently

similar to one another to be consistently directly competitive, thereby favoring exclusion of thin-

film products from the scope of the domestic like product.


**D.  Channels of Distribution**

Next, while hardly conclusive, the Commission found that CSPV products and thin-film

products did not share the same channels of distribution during the POI because they were not

sold into precisely the same markets.  Specifically, "CSPV shipments to the residential segment

in 2011 totaled 715 [megawatts] compared to 1,346 [megawatts] for non-residential shipments

and 631 [megawatts] for utility shipments."  Final Determination at 14 n.76.  On the other hand,

it found that shipments of thin-film products in 2011 to all three segments totaled 35 megawatts

to the residential sector, 50 megawatts to the non-residential sector, and 86 megawatts to the

utility sector.  *See* Final Determination 14.  Thus, the Commission observed that CSPV products

were shipped primarily to the non-residential segment toward the end of the POI (i.e., in 2011),

whereas thin-film products were primarily sold to the utility segment during the same time

period.

Further, questionnaire responses also indicated "that 'CSPV modules are used more

commonly in the space- and weight-constrained commercial and residential market segments

than thin-film modules (thus requiring different distribution channels), while thin-film modules

are used more commonly in the utility-scale market (and are thus dependent on the distribution

channels serving that market).'"[5]  *See* Final Determination at 14 (quoting Final Staff Report at

App. E).  Based on these findings, the Commission determined that there was evidence

demonstrating that, at least toward the end of the POI, both products were primarily used in

different market segments and by different segments of consumers, and thus concluded that this

would require the use of different channels of distribution for thin-film modules and CSPV

modules.  This finding is consistent with the ITC's physical characteristics and

interchangeability findings and its findings related to customer perceptions.

----

[5]         That CSPV modules are more commonly used in space- and weight-constrained
commercial and residential market segments compared to thin-film modules, which are more
commonly used in the utility-scale market segment, was reported to the ITC by [[
                                        ]], in its questionnaire response.  Final Determination at 14.
Plaintiffs object to the ITC's reliance on [[               ]] responses because, in 2010, [[
    ]] identified CSPV producers among its main competitors.  *See* Pls.' Reply in Supp.
of their Mot. for J. on the Agency R. 20–21 (ECF Dkt. No. 46).  The ITC, however, did not rely
solely on [[               ]] responses to its questionnaires to reach its conclusions.  Rather, as is
clear, the Commission relied on a number of sources on the record, among which included [[
              ]] responses and the questionnaire data reported by other companies.  Moreover,
that [[               ]] competes with CSPV producers, on its own, is not grounds for the ITC to
disregard its submission, nor can the court conclude that the Commission's reliance on this
submission, in part, renders its determination unsupported by substantial evidence.

Taking all of the foregoing evidence into account, the ITC was not unreasonable in finding that, because there was evidence tending to demonstrate that both products were sold by different actors into different market segments, the channels of distribution factor, too, modestly supported a finding that thin-film products be excluded from the domestic like product's scope.

**E.  Price**

Last, the ITC found that prices charged for CSPV and thin-film products also demonstrated important differences between the two products.  A majority of domestic producers and importers of CSPV and/or thin-film products (twelve of nineteen U.S. producers and thirty-five of forty-nine importers) reported that CSPV products are generally priced higher on a per-watt basis than thin-film products.  *See* Final Determination at 15.  Further, the Commission noted that, although the price of CSPV products declined during the POI due to a decrease in raw material costs (i.e., for polysilicon), the price differential per watt between CSPV and thin-film products narrowed, but was not eliminated entirely.  Final Determination at 15.

Thus, the ITC reasonably concluded that the price differential, particularly the price per watt, between CSPV and thin-film products, supported the conclusion that the products did not directly compete with one another.  That is, because thin-film products tended to be less expensive per watt, some other factor such as incomplete interchangeability accounted for purchasers choosing to buy CSPV products at all.  Thus, this factor favors the exclusion of thin-film products from the scope of the domestic like product.

### F. Conclusion

When the six factors are considered as a whole, the differences between CSPV and thin-film products are evident, outweighing any broad similarities that the products might otherwise share.  As the ITC observed,

> [t]he record demonstrates a number of differences between CSPV and thin-film products.  Specifically, the two products are manufactured using different raw materials, manufacturing facilities, manufacturing processes, and production employees.  Differences between the two products in terms of chemical composition, weight, size, conversion efficiency, output, inherent properties, and other factors limit their interchangeability after the design phase and in specific projects, and they also limit overlap in distribution channels, particularly for non-utility sales.  A number of market participants reported viewing CSPV and thin-film products as sometimes competitive, but generally different products; they reported CSPV products to be generally higher-priced than thin-film products. On balance, we find that the differences between CSPV and thin-film products are more significant than their similarities in today's evolving marketplace and weigh in favor of a finding of a single domestic like product consisting of the CSPV products within the scope of the investigations.

Final Determination at 16.  Thus, it is clear that the differences in physical characteristics and uses, interchangeability, manufacturing facilities, production processes, production employees, consumer and producer perceptions, channels of distribution, and price all supply the substantial evidence needed to support the ITC's determination to exclude thin-film products from the scope of the investigations.  Accordingly, the ITC reasonably determined, based on record evidence, that the two products do not share similar physical characteristics and end uses.  Importantly, the Commission found that the products' respective capacities to produce electricity were not comparable, and thus that both products were not consistently interchangeable for one another, thereby favoring exclusion of thin-film products from the scope of the domestic like product.

Accordingly, the Commission's determination of the scope of the domestic like product, including its decision to exclude thin-film products from the scope of the domestic like product, is supported by substantial evidence and is sustained.

### III.   THE COMMISSION'S DOMESTIC INDUSTRY ANALYSIS IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Where appropriate, in the course of its investigation, the ITC must determine whether to exclude certain companies from the domestic industry because they are related to an exporter or importer of subject merchandise, or because their interests lie primarily in importing merchandise rather than domestic merchandise production.  This provision was enacted "so that domestic producers whose interests in the imports were strong enough to cause them to act against the domestic industry would be excluded from the ITC's consideration and investigation into material injury or threat thereof."  *USEC, Inc. v. United States*, 25 CIT 49, 61, 132 F. Supp. 2d 1, 12 (2001) (citing *Empire Plow Co. Inc. v. United States*, 11 CIT 847, 852, 675 F. Supp. 1348, 1353 (1987)).  Following the ITC's preliminary investigations, the Commission preliminarily determined that it would not be appropriate to exclude Suntech Arizona[6] or Motech Americas LLC ("Motech")[7] from the domestic industry.  *See* Preliminary Determination at 24; 19 U.S.C. § 1677(4)(B).

In the final investigations, however, SolarWorld urged the Commission to exclude Suntech Arizona and Motech from the domestic industry because their interests did not lie primarily in domestic production.  Final Determination at 19 ("In these final investigations, Petitioner argues that two U.S. producers, Suntech and Motech, import subject merchandise from their affiliates in China and asks the Commission to exclude both from the domestic industry as

---

[6]      Plaintiff Suntech Arizona is a U.S. producer that does not manufacture CSPV cells in the United States, but is an assembler of CSPV modules.  Final Determination at 21.

[7]      Motech is a U.S. producer that does not manufacture CSPV cells in the United States, but is an assembler of CSPV modules.  Final Determination at 22.

related parties based on the claim that these firms' interests do not principally lie in domestic

production.").

In its Final Determination, although the ITC found that both companies were related[8] to

Chinese producers and/or exporters of subject merchandise, the Commission found that

appropriate circumstances existed to exclude Suntech Arizona from the domestic industry but not

Motech.  *See* Final Determination at 22, 23, 24.  Although the Commission found that Motech, a

domestic assembler of CSPV modules, was a related party "because it [was] wholly owned by

the same firm that wholly own[ed] a subject producer/exporter in China,"[9] it nonetheless

concluded that Motech's primary interest was in domestic production, observing, for instance,

that, in January 2010, Motech acquired a Delaware CSPV module manufacturing facility, in

which it made significant investments in the same year.[10]  Final Determination at 22, 23.  The

ITC further found that Motech should be included in the domestic industry based on the

---

[8]        Pursuant to 19 U.S.C. § 1677(4)(B)(ii),
a producer and an exporter or importer shall be considered to be related parties,
if—
   (I) the producer directly or indirectly controls the exporter or importer,
   (II) the exporter or importer directly or indirectly controls the producer,
   (III) a third party directly or indirectly controls the producer and the exporter or
importer, or
   (IV) the producer and the exporter or importer directly or indirectly control a
third party and there is reason to believe that the relationship causes the producer
to act differently than a nonrelated producer.
19 U.S.C. § 1677(4)(B)(ii).

[9]        "Motech reported sourcing the cells used in its U.S. CSPV module operations
from [[
                                                                          ]]."  Final Determination at
23.

[10]        Suntech invested [[                    ]] in the U.S. facility in 2010.  Final
Determination at 22 n.122.

company's ratio of imports to domestic production,[11] because it had invested in research and development in its U.S. facility,[12] and based on its performance relative to the industry average during the POI.[13]  *See* Final Determination at 23.  The ITC thus determined that, based on Motech's financial performance during the POI (i.e., whether the company benefitted from its importing activities), its capital expenditures, and research and development expenses, that it was not "appropriate to exclude Motech from the domestic industry as a related party."  *See* Final Determination at 24.

        As to Suntech Arizona, also a U.S. assembler of CSPV modules, however, the ITC reached a different conclusion and determined to exclude the company from the domestic industry.  In doing so, the ITC found that the company was "a related party both by virtue of its imports of subject merchandise and because its corporate grandparent also wholly own[ed] four subsidiaries in China that produce[d]/export[ed] subject merchandise to the United States."  Final Determination at 22.  In addition to its close relationship with Chinese companies involved in the production and exportation of subject merchandise, the Commission excluded Suntech Arizona from the domestic industry because of the company's U.S. investment history and its financial

---

        [11]     The Commission found that, "[a]s a ratio to domestic production, [Motech's] total subject imports from China were [[   ]] percent in 2009, [[     ]] percent in 2010, [[     ]] percent in 2011, [[       ]] percent in interim 2011, and [[   ]] percent in interim 2012."  Final Determination at 23.

        [12]     The Commission found that Motech incurred [[
                                                                                          ]].
Final Determination at 23.

        [13]     The Commission found that Motech's operating performance was [[
                                                ]], and [[          ]] the industry average [[
        ]].  Final Determination at 23.

performance.[14]  *See* Final Determination at 22.  To support these findings, the Commission

pointed to several different factors, including Suntech Arizona's reported level of financial

investment in research and development at its U.S. facility, its importing activities related to

subject merchandise, and its overall financial performance during the POI in relation to the

domestic industry.[15]  *See* Final Determination at 21–22.

Plaintiffs argue that the Commission erred in its exclusion of Suntech Arizona from the

domestic industry and that this error rendered the ITC's Final Determination unsupported by

substantial evidence.  Plaintiffs contend that, except for one minor difference,[16] Suntech

Arizona's activities were akin to those of other domestic producers, which the Commission did

not exclude.  *See* Pls.' Br. 44.  Plaintiffs further maintain that the Commission applied the factors

of its analysis inconsistently between Suntech Arizona and Motech, resulting in Motech's

inclusion in, and Suntech Arizona's exclusion from, the domestic industry.  *See* Pls.' Br. 44–45.

---

[14]        That is, the ITC concluded that Suntech Arizona [[
                    ]].  *See* Final Determination 22.

[15]        In addition, the Commission considered Suntech Arizona's [[
                    ]].  *See* Final Determination at 21.
The Commission found that Suntech Arizona [[
            ]] in the United States during the POI, was importing the cells used in its
CSPV modules from [[
                    ]] imported a volume of subject imports that were [[
                    ]] and had [[
            ]].  *See* Final Determination at 21, 22.  In addition, the Commission found that
Suntech Arizona's financial performance, [[

            ]].  Final Determination at 22.

[16]        Plaintiffs insist that the only difference between Suntech Arizona and other
companies, such as Motech, which the Commission determined not to exclude from the domestic
industry, was that Suntech Arizona [[
            ]].  *See* Pls.' Br. 44.

The court holds that the ITC's determination as to the composition of the domestic

industry, including its decision to exclude Suntech Arizona from the domestic industry, is

supported by substantial evidence.

"[A]lthough little legislative history behind the related parties provision exists, the

provision's purpose is to exclude from the industry headcount domestic producers substantially

benefitting from their relationships with foreign exporters." *USEC*, 25 CIT at 61, 132 F. Supp.

2d at 12.  The statute defines "[t]he term 'industry' [to] mean[] the producers as a whole of a

domestic like product, or those producers whose collective output of a domestic like product

constitutes a major proportion of the total domestic production of the product." 19 U.S.C. §

1677(4)(A).  According to the statute, "[i]f a producer of a domestic like product and an exporter

or importer of the subject merchandise are related parties, or if a producer of the domestic like

product is also an importer of the subject merchandise, the producer may, in appropriate

circumstances, be excluded from the industry." *Id.* § 1677(4)(B)(i).

The Commission will find that a producer and an exporter or importer are related parties

if

> (I) the producer directly or indirectly controls the exporter or importer,
> (II) the exporter or importer directly or indirectly controls the producer,
> (III) a third party directly or indirectly controls the producer and the exporter or
> importer, or
> (IV) the producer and the exporter or importer directly or indirectly control a third
> party and there is reason to believe that the relationship causes the producer to act
> differently than a nonrelated producer.

*Id.* § 1677(4)(B)(ii).  Further, the Commission will find that a party "directly or indirectly

control[s] another party if the party is legally or operationally in a position to exercise restraint or

direction over the other party." *Id.* § 1677(4)(B).

In addition, "19 U.S.C. § 1677(4)(B) permits the Commission to exclude domestic

producers who import subject merchandise from the definition of domestic industry, if it

determines that appropriate circumstances exist for exclusion."  *Allied Mineral*, 28 CIT at 1864.

This Court has found that "[t]he most significant factor . . . in making the 'appropriate

circumstances' determination is whether the domestic producer accrued a substantial benefit

from its importation of the subject merchandise."  *Id.* (citing *Empire Plow*, 11 CIT at 853, 675 F.

Supp. at 1353).  This Court has also repeatedly upheld the Commission's use of the particular

factors as part of its determination as to whether to exclude producers who have accrued a

substantial interest in the subject merchandise:

> (1) the percentage of domestic production attributable to the importing producer;
> (2) the reason the U.S. producer has decided to import the product subject to
> investigation (whether to benefit from unfair trade practice or to enable them to
> continue production and compete in the domestic market); (3) whether inclusion
> or exclusion of the importing producer will skew the data for the rest of the
> industry; (4) the ratio of import shipments to U.S. production for the importing
> producer; and (5) whether the primary interest of the importing producer lies in
> domestic production or importation.  The Commission is not required to make
> findings as to each specific factor.

*Id.* at 1865 (citation omitted) (citing *Sandvik AB v. United States*, 13 CIT 738, 748, 721 F.

Supp. 1322, 1332 (1989), *aff'd*, 904 F.2d 46 (Fed. Cir. 1990); *Torrington Co. v. United*

*States*, 16 CIT 220, 224, 790 F. Supp. 1161, 1168 (1992)).

Here, the Commission considered the benefit the company received as a result of

its relationship with exporters from China and reasonably determined that Suntech

Arizona was enjoying substantial benefits from its importation of solar cells from China.

*See* Final Determination at 22.  To support its determination, the Commission relied on

record evidence that indicated that Suntech Arizona's interests rested primarily with the

importation of CSPV products rather than with domestic production of the domestic like

product.  For example, it evaluated Suntech Arizona's ratio of total subject imports from

China to its domestic production (based on kilowatts) throughout the POI.[17]  *See* Final

Determination at 21.

     Although plaintiffs argue that the decrease in Suntech Arizona's ratio of subject imports

to domestic production demonstrates that the company had developed a more substantial

commitment to domestic production, even if true, this trend does not undermine the ITC's

conclusion that, during the POI, based on the entire record before it, Suntech Arizona's interests

did not lie primarily with the domestic industry.  While the ratio of subject imports to domestic

production decreased during the latter part of the POI, the Commission found that Suntech

Arizona's importing activity remained substantial relative to its domestic production.  Final

Determination at 22.

     In addition to its high ratio of imports to domestic production, the ITC also looked to

Suntech Arizona's robust operating performance when compared to the industry average during

the POI, particularly in the latter part of the POI.[18]  *See* Final Determination at 21, 22.  Also, the

Commission examined the company's level of investment in research and development in its

---

[17]     The ITC found that Suntech Arizona imported [[
]].  Specifically, the Commission found that the ratio
of Suntech Arizona's total subject imports to its domestic production was [[    ]] percent in 2009,
[[          ]] percent in 2010, [[          ]] percent in 2011, [[          ]] percent in the first six
months of 2011, and [[          ]] percent in the first six months of 2012.  Final Determination at
21.

[18]     The Commission found that Suntech Arizona's operating performance [[
]] the industry average [[
]].  Final Determination at 21.

U.S. facilities during the POI[19] and reasonably concluded that these findings also supported its

conclusion that Suntech Arizona's interests were primarily in importing rather than domestic

production.[20]  Final Determination at 21–22.  Having reviewed these findings, the court finds

that the ITC reasonably determined, based on substantial record evidence, that Suntech Arizona,

although a "domestic producer[,] accrued a substantial benefit from its importation of the subject

merchandise." *See Allied Mineral*, 28 CIT at 1864 (citing *Empire Plow*, 11 CIT at 853, 675 F.

Supp. at 1353).

Next, the court finds plaintiffs' argument that the factors were not applied in a consistent

manner to both Suntech Arizona and Motech unconvincing.  This is because the facts that the

Commission found were dramatically different for Suntech Arizona and Motech.  For instance,

the ITC observed differences[21] between the two companies during the POI, including (1)

Motech's ratio of subject imports to domestic production,[22] (2) Motech's financial performance

---

[19]      The ITC found that Suntech Arizona invested [[
                                                      ]], but it did [[
         ]] during the POI.  Final Determination at 21.

[20]      Although plaintiffs maintain that Suntech Arizona's U.S. capital expenditures of
[[                                                      ]] demonstrate that the company "was
evolving from an importer to a committed domestic producer," the [[
                                                      ]] suggests that Suntech Arizona's interests were
primarily with importing rather than with domestic production.  *See* Pls.' Br. 43.

[21]      Suntech Arizona's [[                                                      ]] in these
investigations is also relevant record evidence on which the Commission reasonably relied, as
plaintiffs have pointed to no precedent or law, and the court can find none, that would prohibit
the ITC from considering a company's actions where it [[
                                                      ]].  Indeed, unlike Suntech Arizona,
Motech [[                                                      ]].  *See* Final
Determination at 23.

[22]      The ITC found that, "[a]s a ratio to domestic production, [Motech's] total subject
imports from China were [[    ]] percent in 2009, [[      ]] percent in 2010, [[        ]] percent in
                                                      (footnote continued)

relative to the industry average,[23] and (3) Motech's levels of investment in research and

development in its domestic facilities.[24]  Each of these factors distinguished Motech from

Suntech Arizona, supporting the ITC's finding that these two companies' experiences during the

POI were not comparable to one another and thus that Motech and Suntech Arizona did not

require similar treatment.  Based on the foregoing, the Commission was reasonable in its

decision to include Motech in the domestic industry and to exclude Suntech Arizona.

Accordingly, the Commission's domestic industry analysis is sustained.


IV.    **THE COMMISSION'S AFFIRMATIVE MATERIAL INJURY DETERMINATION IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW**

       At the conclusion of its investigations, the ITC sought to ascertain whether the domestic

industry, which manufactured the domestic like product of the subject merchandise, was

materially injured or threatened with material injury by reason of the subject imports.  *See* 19

U.S.C. §§ 1673, 1671(a).  The Commission considered the volume, price effects, impact of

subject imports, and other external market factors, and determined that the domestic industry was

---

2011, [[      ]] percent in interim 2011, and [[    ]] percent in interim 2012."  Final
Determination at 23.

       [23]      The Commission observed that "Motech's ratio of operating income to net sales
was [[

                                          ]]."  Final Determination at 23.  In addition, the ITC
found that Motech's "operating performance was [[
                          ]] the industry average [[                              ]]."  Final
Determination at 23.

       [24]      The Commission found that, "[i]n terms of capital expenditures, Motech invested
[[

                          ]]."  Final Determination at 23.

being materially injured by reason of the entry of subject imports into the United States. *See*

Final Determination at 3.


### A. "By Reason of" and "But for" Causation Standard

Plaintiffs challenge the ITC's material injury determination, claiming that it failed to

consider the special circumstances of the solar panel industry and marketplace as part of its

determination. *See* Pls.' Br. 12. Specifically, plaintiffs insist that the Commission should have

undertaken a "but for" causation inquiry and that the failure to do so rendered its determination

contrary to law. *See* Pls.' Br. 12 ("Plaintiffs submit that the Commission's determination that the

U.S. CSPV industry 'is materially injured by reason of subject imports' was unsupported by

substantial evidence, and therefore not in accordance with law. . . . That is, the Commission

failed to undertake any analysis to consider whether, given these conditions of competition,

subject imports could truly be the 'but for' cause of the injury suffered by the domestic

industry." (citation omitted) (quoting Final Determination at 58)).

In making their argument, plaintiffs assert that three considerations demonstrate that the

conditions of the domestic industry would have been the same irrespective of whether their

products were available in the U.S. market because (1) the price and demand for CSPV products

are tied to the need to achieve grid parity, (2) the government incentives that stimulated demand

for CSPV products in the United States were being phased out during the POI, and (3) the fastest

growth in demand during the POI was in the utility sector where grid parity and government

incentives had the greatest effect. *See* Pls.' Br. 4–5. Thus, for plaintiffs, had the ITC undertaken

a proper "but for" causation analysis, it would have determined that the domestic industry had

suffered injury, not as a result of the sale of subject imports at low dumped prices (i.e., "but for"

the imports of subject merchandise), but rather, as a result of other factors extant in the

marketplace. Therefore, for plaintiffs, the ITC's chosen methodology was unreasonable and its

conclusions unsupported by substantial evidence.

After considering plaintiffs' arguments, the court finds that it cannot agree with parts of

plaintiffs' characterization of the ITC's legal obligation when making its material injury

determination.

For an antidumping duty order to issue, in addition to Commerce's finding of sales at less

than fair value, the Commission must make an affirmative injury determination, which "requires

both (1) present material injury[25] and (2) a finding that the material injury is 'by reason of' the

subject imports." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 719 (Fed. Cir. 1997)

(citations omitted). "Material injury is defined as 'harm which is not inconsequential,

immaterial, or unimportant.'" *Nucor Corp. v. United States*, 414 F.3d 1331, 1335 (Fed. Cir.

2005) (quoting 19 U.S.C. § 1677(7)(A)). The ITC, when making a materiality determination, is

directed by 19 U.S.C. § 1677(7)(B)(i) to weigh factors identified by the statute, including "the

volume of imports, the price effects of those imports, and the impact of those imports on the

affected domestic industry." *Caribbean Ispat Ltd. v. United States*, 450 F.3d 1336, 1337 (Fed.

Cir. 2006) (citing 19 U.S.C. § 1677(7)(B)(i)). When making its "by reason of" determination,

the ITC is also directed to "evaluate all relevant economic factors . . . within the context of the

business cycle and conditions of competition that are distinctive to the affected industry." 19

U.S.C. § 1677(7)(C)(iii). "In addition to those factors, the Commission may consider 'such other

---

[25]     Although not relevant here, an antidumping duty order may also issue should the
Commission find that "an industry in the United States is threatened with material injury by
reason of imports . . . of the subject merchandise." *See* 19 U.S.C. § 1677(7)(F)(i).

economic factors as are relevant to the determination.'"  *Caribbean Ispat*, 450 F.3d at 1337–38

(quoting 19 U.S.C. § 1677(7)(B)(ii)).

The Federal Circuit has explained that, at least in cases involving commodity products,

i.e., merchandise that is "interchangeable regardless of its source," "in which non-[less-than-fair-

value] imported goods are present in the market, the Commission must give consideration to the

issue of 'but for' causation by considering whether the domestic industry would have been better

off if the dumped goods had been absent from the market."  *Bratsk Aluminium Smelter v. United

States*, 444 F.3d 1369, 1371 (Fed. Cir. 2006); *Mittal Steel Point Lisas Ltd. v. United States*, 542

F.3d 867, 876 (Fed. Cir. 2008).  Thus, in such instances, "where commodity products are at issue

and fairly traded, price competitive, non-subject imports are in the market," "inquiry into 'but

for' causation [is] a proper part of the Commission's responsibility to determine whether the

injury to the domestic industry is 'by reason of' the subject imports."  *Mittal Steel*, 542 F.3d at

877, 878 (quoting *Bratsk*, 444 F.3d at 1373) (internal quotation marks omitted).

In establishing this rule, the Federal Circuit was concerned that, when reviewing the

conditions of a domestic industry for a commodity product, an overwhelming presence of price

competitive and interchangeable non-subject imports in the market during the period of

investigation might escape the ITC's proper consideration.  That is, in such cases, the ITC might

incorrectly attribute the domestic industry's injury to the subject imports when the industry's

damaged condition was actually "by reason of" substantially similar non-subject imports.

Hence, when presented with price competitive and highly substitutable non-subject imports of a

commodity product, in order to satisfy its statutory duty, *Mittal Steel* requires the ITC "to

consider the 'but for' causation analysis . . . to determine whether the subject imports were a

substantial factor in the injury to the domestic industry, as opposed to a merely 'incidental,

tangential, or trivial' factor." *Id.* at 879 (quoting *Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1381 (Fed. Cir. 2003)).

Here, plaintiffs urge the court to extend the application of the "but for" causation analysis to the facts of this case. Plaintiffs attempt to liken their case to that of *Mittal Steel* and its predecessors, arguing that, although their subject merchandise is not a commodity product, the marketplace in which it was sold presents analogous "unique circumstances" as those found by the Federal Circuit to be present in each of those cases. *See* Pls.' Br. 22 ("[T]he present case involves subject imports of *technology used to produce a commodity product*—i.e., electricity— which the Commission recognized competes with non-subject technologies used to produce the same commodity product in the U.S. market." (emphasis added)).

Although the Federal Circuit has limited the use of the "but for" test to injury determinations involving (1) commodity products and (2) where there were non-subject, price competitive imports in the domestic market during the period of investigation, this Court has found that, where, as here, the case does not involve a commodity product, the Commission, nevertheless, is not relieved of its responsibility to "consider potential alternate causes of harm in its . . . analysis." *See LG Electronics, Inc. v. U.S. Int'l Trade Comm'n*, 38 CIT __, __, 26 F. Supp. 3d 1338, 1351 (2014) (citing *Mittal Steel*, 542 F.3d at 878).

Moreover, although the Federal Circuit has used the phrase "but for" in several cases, it is apparent that the statutory "by reason of" standard, which applies to every injury determination, has not been materially altered. *See NSK Corp. v. United States*, 33 CIT 1185, 1189, 637 F. Supp. 2d 1311, 1317 (2009) ("[T]he Federal Circuit's opinion in *Mittal* did not constitute an intervening change in the controlling law." (citing *NSK Corp. v. United States*, 32 CIT 1497, 1508–16, 593 F. Supp. 2d 1355, 1367–72 (2008))); *see also Mittal Steel*, 542 F.3d at 879 n.2

("Commissioners Pearson and Okun have noted that interpreting *Bratsk*[26] in that manner, i.e., as 'a reminder that the Commission, before it makes an affirmative determination, must satisfy itself that it has not attributed material injury to factors other than subject imports,' is consistent with the Commission's obligation to 'analyze the effects of the unfairly traded imports and other relevant factors in a way that enables the Commission to conclude that it has not attributed the effects of other factors to the subject imports.'" (citation omitted)).

Thus, the words "but for" merely point out that, when making a material injury determination, the Commission must take into account all record evidence that has a bearing on the factors considered in reaching its determination.  Therefore, if there is non-subject merchandise present in the market that competes with subject imports, or record evidence that might supply some other reason for the cause of injury to the domestic industry, the ITC must take it into account.  *See Mittal Steel*, 542 F.3d at 878; *Nucor Corp. v. United States*, 32 CIT 1380, 1449, 594 F. Supp. 2d 1320, 1382, 1383 (2008) ("Nevertheless, this holding should not be read to provide the Commission license to unilaterally disregard data related to non-subject imports during a sunset review, if it finds that such imports are a 'relevant economic factor[]' to its determination. . . . To be sure, it would be an abuse of discretion for the ITC to ignore such important factors if they were relevant." (alteration in original) (footnote omitted) (citations

---

26      In *Bratsk*, the Federal Circuit vacated and remanded the ITC's material injury determination with respect to silicon metal imports from Russia, finding that the Commission had failed to "address whether the non-subject imports would have replaced subject imports during the period of investigation" and continued to cause injury to the domestic industry.  *See Bratsk*, 444 F.3d at 1376.  The *Bratsk Court* explained that, "under *Gerald Metals*, the Commission is required to make a specific causation determination and in that connection to directly address whether non-subject imports would have replaced the subject imports without any beneficial effect on domestic producers."  *Id.* at 1375.  The Court further explained that "[t]he obligation under *Gerald Metals* is triggered whenever the antidumping investigation is centered on a commodity product, and price competitive non-subject imports are a significant factor in the market."  *Id.*

omitted) (quoting 19 U.S.C. § 1675a(a)(2), (4) (2000))), *aff'd*, 601 F.3d 1291 (Fed. Cir. 2010);

*NSK Corp. v. United States*, 32 CIT 966, 973, 577 F. Supp. 2d 1322, 1332–33 (2008)

("Moreover, application of *Bratsk* to sunset review causation analysis would compel the ITC to

address significant increases in market share by non-subject imports and thereby examine the

effectiveness of the underlying antidumping order in relation to fundamental changes in the

marketplace that might be more likely to cause injury to the domestic industry than unrestrained

subject imports.  The court views this analysis as a necessary step in establishing causation under

[19 U.S.C.] § 1675a(a)(1).  To hold otherwise would permit the ITC to ignore a significant factor

affecting the domestic industry when conducting a sunset review." (citation omitted)).

     In this case, although it has chosen not to use the specific words "but for" in its Final

Determination, the ITC has properly framed the legal basis upon which to determine whether the

material injury sustained by the domestic industry is "by reason of" subject imports.  *See* Final

Determination at 58 ("Based on the foregoing trends, we find that there is a causal nexus

between subject imports and the poor condition of the domestic industry and that the domestic

industry is materially injured by reason of subject imports.").  Before the court, in addition to

properly framing the legal basis of its determination, the ITC must support with substantial

evidence any findings it makes about the conditions in the marketplace.

     The court, in turn, must determine whether the Commission properly considered the

impact of those factors present in the marketplace (i.e., grid parity, incentive programs, and

utility sales) claimed by plaintiffs to have caused the injury to the domestic industry when

reaching its determination that the material injury sustained by the domestic CSPV industry was

"by reason of" subject imports.  Here, it is apparent that the Commission properly took into

account evidence demonstrating that the injury sustained by the domestic industry was "by

reason of" subject imports and not caused by other claimed marketplace factors present in the

United States during the POI.


**B. The Commission Properly Considered the Claimed Conditions of Competition**

"When evaluating challenges to the ITC's choice of methodology, the court will affirm

the chosen methodology as long as it is reasonable." *JMC Steel*, 38 CIT at __, Slip Op. 14-120,

at 13 (citations omitted).  That is, "[w]hen presented with a challenge to the Commission's

methodology, the court examines 'not what methodology [plaintiffs] would prefer, but . . .

whether the methodology actually used by the Commission was reasonable.'" *Id.* (alteration in

original) (citing *Shandong TTCA Biochemistry Co. v. United States*, 35 CIT __, __, 774 F. Supp.

2d 1317, 1329 (2011)).  "While the Commission may not enter an affirmative determination

unless it finds that a domestic industry is materially injured 'by reason of' subject imports, the

Commission is not required to follow a single methodology for making that determination."

*Mittal Steel*, 542 F.3d at 873.  Thus, "[i]f the methodology is valid, then the question simply

resolves to whether analysis of the substantiality of the evidence of record supports the

conclusion drawn." *Swiff-Train Co. v. United States*, 38 CIT __, __, 999 F. Supp. 2d 1334, 1345

(2014).

As noted, plaintiffs insist that, had the Commission properly considered the roles of grid

parity, declining incentive programs, and increased growth in demand in the utilities sector

during the POI, it would have found that the condition of the domestic industry would have been

the same even if subject imports were not present in the U.S. market.  *See* Pls.' Br. 26 ("Taken

together, this means that even if subject imports had not been present in the U.S. market, the

picture of the domestic industry would have been the same as the one observed by the

Commission in its Views—i.e., domestic producers would have: (1) equally been unable to sell

their products; (2) equally faced pressure to lower prices; (3) equally lost money throughout the

POI; (4) equally experienced declines in many of its performance indicators; and (5) equally

recognized asset write-offs and/or increased costs.").  Plaintiffs contend that the ITC did not

evaluate material injury "within the context of the business cycle and conditions of competition

that are distinctive to the affected industry" as required by 19 U.S.C. § 1677(7)(C)(iii), and thus

that "the Commission's evaluation of volume, price effects, impact, and causation, within the

context of the relevant conditions of competition, is unsupported by substantial evidence."  *See*

Pls.' Br. 14–15; 19 U.S.C. § 1677(7)(C)(iii).

      The court is unpersuaded by this argument and finds that the Commission adequately

addressed the claimed conditions of competition that were present in the U.S. market in

accordance with its obligations under the statute, and reasonably determined, based on

substantial record evidence, that the material injury sustained by the domestic industry during the

POI was "by reason of" subject imports.  *See Mittal Steel*, 542 F.3d at 879.

      As shall be seen, the Commission informed its analysis by evaluating a number of

conditions of competition present in the U.S. CSPV market and the role that each played during

the POI with respect to the injury sustained by the domestic CSPV industry: (1) the emergence of

alternative energy technologies, such as the increased supply, and declining price, of natural gas;

(2) the declining cost of polysilicon, a primary input used in the manufacture of CSPV products;

(3) the availability of federal, state, and local government incentives to the CSPV domestic

industry; (4) the supply and demand conditions for CSPV products in the United States, which

were characterized by high demand and subject imports obtaining domestic market share at the

expense of the domestic industry; (5) the growing demand for CSPV products in the utility

sector; (6) the decline in market share of non-subject imports (i.e., imports of CSPV products

from countries other than China); and (7) the impetus toward grid parity (i.e., CSPV products'

ability to generate electricity at a price matching the cost of power from the electric grid and thus

compete for electricity sales with other energy sources).  Having reviewed its analysis, the court

finds that the ITC reasonably reached its conclusion with respect to injury and adequately took

into account the "novel conditions of competition" with which plaintiffs claim it failed to "come

to grips."  *See* Pls.' Br. 12.  Accordingly, its determination is sustained.


### 1.  *Alternative Energy Technologies and Polysilicon Prices*

The first two conditions analyzed by the ITC were the impact of alternative energy

technologies and the declining cost of polysilicon on the domestic CSPV industry.  Although,

importantly, plaintiffs do not challenge these aspects of the Final Determination, the ITC relied,

in part, on its findings regarding the impact of alternative energy technologies and the decline in

cost of polysilicon during the POI to reach its determination that the domestic industry was

materially injured "by reason of" subject imports.  Consequently, although the ITC's findings

relating to these conditions of competition are not at issue in this case, they are nonetheless

worthy of some examination in order to demonstrate that the ITC properly took into account

record evidence bearing on the conditions in the marketplace during the POI.

With respect to energy technologies other than solar, the Commission observed that,

"[d]uring the POI, increases in the use of 'fracking' technologies and shale drilling expanded the

supply of natural gas in the United States."  Final Determination at 32.  It found that this increase

in supply "caused natural gas prices to decline and stimulated demand for natural gas-fueled

electricity for peak periods at the expense of other electricity sources such as CSPV products."

Final Determination at 32.  In addition, the Commission found that "[c]ompetition with

renewable-energy electricity-generators such as thin-film solar systems . . . affect[ed] demand for

CSPV solar systems and their components."  Final Determination at 32.  In other words, as to

this latter consideration, the ITC found that electricity provided by CSPV products competed for

sales in the United States with electricity generated from natural gas and renewable energy

sources.  Therefore, the ITC found that price competition between energy-producing

technologies was present in the marketplace.

As to polysilicon, it is a key raw material input used in the manufacture of CSPV

products, accounting for nearly one quarter of the production cost to manufacture a finished

CSPV module, and thus, high prices for polysilicon can have adverse effects on the profit

margins of manufacturers.  *See* Final Determination at 42 n.247.  Lower prices for polysilicon,

on the other hand, would have a positive effect on the bottom line.

The ITC found that "[d]eclining polysilicon prices eroded the advantage thin-film

products may have had over CSPV products in terms of price, but thin-film producers . . .

continued to improve their efficiencies to stay competitive."  Final Determination at 32.  The

Commission stated that, "as technology improved, the price of [photovoltaic products[27]] ha[d]

trended downward since the 1990s, despite a period of increasing prices between 2003 and

2008."  Final Determination at 51.  Further, it found that, since 2003, "when global supply of

polysilicon was inadequate to meet demand by both the semiconductor and CSPV industries,

polysilicon prices rose substantially.  Spot prices of polysilicon rose from $35/[kilogram] in 2003

---

[27]       Photovoltaic products encompass all electricity-producing devices "that use[] the
basic properties of semiconductor materials to transform solar energy into electrical power,"
including those using CSPV and thin-film technologies.  *See* Pre-Hearing Br. of China Chamber
of Commerce for Import and Export of Machinery and Electronic Products (Volume I of I), Ex. 1
at 1, CD 396 at Doc. No. 491422 (Sept. 20, 2012), ECF Dkt. No. 67-2.

to a high of $500/[kilogram] in 2008 (and contract prices rose from $25/[kilogram] to

$85/[kilogram] in this period)." Final Determination at 51.  The Commission also commented,

though, that, "[b]y 2008, global supply [of polysilicon] exceeded global demand, and polysilicon

spot and contract prices then fell substantially . . . in 2011 . . . and . . . 2012." *See* Final

Determination at 51.  Thus, the ITC observed that polysilicon costs began to decline well before

the POI and continued to do so.  Moreover, the Commission explained that, although "the price

of solar modules sold in the United States also declined dramatically during the POI, by 50

percent in 2011, this decline (and the declines in prices of the domestic like product observed in

the pricing data) exceeded declines in the cost of the polysilicon raw materials used to produce

CSPV products."[28]  Final Determination at 51.  Hence, the Commission concluded that the

declining cost of polysilicon and thus the declining cost to manufacture CSPV products,

improved CSPV products' ability to compete with other products that generate electricity, such

as thin-film.  Indeed, as shall be seen, this increased capability to compete for sales as a result of

declining production costs improved CSPV products' ability to compete for grid parity during

the POI against other energy sources.

Accordingly, although it found that price competition from technologies that produced

electric energy, such as electricity produced by natural gas, increased, CSPV products

nonetheless were not priced out of the market due, in large part, to the declining cost of

polysilicon, a key input used in the manufacture of CSPV products.

---

[28]     Specifically, the ITC found that the cost of polysilicon raw materials used to
produce CSPV products experienced declines of "up to [[      ]] percent between 2010 and 2011
based on published polysilicon pricing data or about [[      ]] percent based on reported
domestic industry costs of polysilicon ingots and wafers."  Final Determination at 51–52.

## 2.  *Government Incentives*

The ITC next examined the role of government incentives in the domestic CSPV industry

during the POI.  *See* Final Determination at 33 ("Changes in the availability and scope of

Federal, state, and local government incentives . . . played an important role in demand for CSPV

products during the POI.").  Plaintiffs maintain that, although the ITC analyzed the role that

government incentives played in stimulating demand for CSPV products in the United States, the

Commission failed to appreciate that these incentives declined during the POI and thus that the

domestic industry lost the ability to compete with subject imports and would not have obtained

any additional sales even if there were no subject imports present in the U.S. market.  *See* Pls.'

Br. 4–5.

The Commission began its analysis of this market condition by explaining that, "[i]n

order to help make solar a viable alternative energy source, Federal, state, and local governments

created programs intended to reduce the cost of solar-generated electricity (and electricity

generated by other renewable energy sources)" with the purpose of "assisting solar power

developers to achieve sufficient economies of scale to become competitive with conventional

energy sources."  *See* Final Determination at 33.  In addition, as plaintiffs point out, the ITC

acknowledged that "[t]hese programs and their benefits were designed to decline over time, as

the cost to generate solar-powered electricity declined."  Final Determination at 33.  Contrary to

plaintiffs' assertions, however, the Commission found that, "[d]uring the POI, Federal, state, and

local incentives successfully stimulated demand for CSPV products in the United States, with

industry publications reporting that Federal incentives caused an 'application boom' and an

'installation boom' of solar projects."  Final Determination at 33.  Further, the ITC found that the

questionnaire respondents confirmed this finding, as they "generally report[ed] that Federal,

state, and local incentives increased demand for CSPV products since 2009."[29]  Final

Determination at 33.  Put another way, the Commission found that these incentives increased the

demand for CSPV products during the POI.

More specifically, with respect to federal incentives, the Commission found that, "during

the POI, the United States had in place two major tax incentives that provided benefits to

systems owners (as opposed to manufacturers of solar products): the Federal Investment Tax

Credit ('FITC') and the Grant in Lieu of Tax Credit, also known as the Section 1603 Treasury

Program ('GLTC')."  Final Determination at 33–34.  The FITC program, which was established

in 2005 and extended under the Emergency Economic Stabilization Act of 2008 ("EESA"),

initially "provided a 30-percent investment tax credit to commercial and residential customers

installing solar energy systems, but did not extend the credit to public utilities."  Final

Determination at 34.  The EESA extended this tax credit through 2016, after which, the ITC

found the credit was to decline to 10 percent.  Final Determination at 34.  Importantly, "[t]he

EESA also waived the public utility exemption [after 2008], thereby allowing utilities to invest

directly in solar facilities for the first time."  Final Determination at 34.

In 2009, Congress passed the GLTC program as part of the American Recovery and

Reinvestment Act, providing "30-percent cash grants for commercial solar facilities that were (1)

placed in service in 2009 or 2010, or (2) placed in service between January 1, 2010 and January

1, 2017, so long as construction began in 2009 or 2010."  Final Determination at 34.  Although

the GLTC program was set to expire at the end of 2010, "Congress extended it, allowing

applicants to receive cash grants so long as construction of the commercial solar facilities

---

[29]      Eleven of fourteen producers, thirty-six of forty-six importers, and twenty-seven of forty-four purchasers reported that state and local incentives had stimulated demand since January 2009.  Final Determination at 33 n.185.

commenced by the end of December 2011 and finished by December 2016." Final

Determination at 34–35. Hence, the ITC found that there remained a favorable mix of federal

subsidies in effect during the POI for producers and consumers of solar energy in both residential

and commercial sectors.

As to the availability of state and local incentives, the Commission found that thirty-six

states, the District of Columbia, Puerto Rico, and various local governments stimulated the use

of renewable energy sources through renewable energy programs of various scopes and durations

across the United States during the POI. *See* Final Determination at 35. The Commission found

that "[t]hese programs generally require[d] retail electricity suppliers to procure a minimum

amount of renewable energy, such as wind and solar, usually as a percentage of their total energy

generation by a given date, or suffer a non-compliance penalty." Final Determination at 35.

As to plaintiffs' claim that the Commission failed to appreciate the phasing out of these

incentives, the ITC acknowledged the phase-out or partial termination of certain government

incentive programs but found "that, during much of the POI, the overall mix of incentives was

[nonetheless] very favorable and stimulated demand substantially." Final Determination at 52.

It also observed that various federal, state, and local incentives remained available at the end of

the POI and that "apparent U.S. consumption continued to increase." Final Determination at 52–

53. Moreover, the Commission concluded that there was nothing on the record to suggest that

any partial termination or phase-out of incentives during the POI "led to any significant

imbalance in supply and demand that would have caused the observed declines in prices of the

domestic like product." Final Determination at 53. Thus, although plaintiffs claim otherwise,

the ITC considered the presence of government incentives in the marketplace and found that

federal, state, and local government incentives remained widely available throughout the POI

and that, as a result, U.S. demand for, and consumption of, CSPV products during the POI

continued to increase.  That is, the Commission concluded that any effect the availability of

government incentives had on the domestic industry during the POI could not explain the injury

that they sustained during this time period.


### 3.   *Supply and Demand Conditions*

The Commission next examined the volume of CSPV products available in the United

States.  It found that the U.S. market had available shipments of CSPV products from the

domestic industry, subject imports (i.e., from China), and non-subject imports (i.e., from foreign

countries other than China).  Final Determination at 37.  While plaintiffs do not question the

ITC's findings directly with respect to the conditions of supply and demand, they renew their

claim that the Commission's findings regarding the impact of government incentives was

unsupported by the evidence and thus that the Commission's failure to appreciate the

significance of this condition caused the ITC to reach mistaken conclusions regarding the

conditions of supply and demand present in the CSPV market in the United States during the

POI.  *See* Pls.' Br. 33–34.

With respect to the conditions of supply and demand, the ITC found that both the

domestic industry *and* non-subject imports (i.e., imports of CSPV products from countries other

than China) lost significant market share during the POI, while subject imports from China

gained significant market share during the same period.[30]  Final Determination at 37–38.  The

---

[30]      The ITC found that "[t]he domestic industry's share of the U.S. market declined
from [[        ]] percent in 2009 to [[        ]] percent in 2011; its share of the market was [[        ]]
percent in interim 2011 and [[        ]] percent in interim 2012."  Final Determination at 37.  It
also found that "the market share of non-subject imports declined from [[        ]] percent in 2009
(footnote continued)

ITC found that domestic demand for CSPV products grew at a rapid rate during the POI, but that

the volume of subject imports grew at a substantially faster rate than U.S. consumption and

surpassed the domestic industry's U.S. shipments by 2010.[31]  *See* Final Determination at 42–43.

The ITC thus concluded "that subject imports had a significant adverse impact on the domestic

industry during the POI" and that "the domestic industry's financial performance was very poor

and deteriorating because of the significant volume and adverse price effects of subject imports."

Final Determination at 54.

In addition, the ITC found that subject imports increased their market share significantly

during the POI at the expense of the domestic industry and non-subject imports in each of the

major U.S. market segments (i.e., residential, non-residential, and utility).[32]  Final Determination

at 43 & n.256, 44.  The ITC found that "the domestic industry progressively increased capacity

and had available production capacity throughout the POI," which indicated that, contrary to

plaintiffs' assertions, the domestic CSPV industry "was capable of supplying additional

demand."  Final Determination at 44.  The Commission further noted that "the ratio of subject

---

to [[      ]] percent in 2011."  Final Determination at 37.  It further found that Chinese subject
imports' market share rose from [[      ]] percent in 2009 to [[      ]] percent in 2011, and that,
"in interim 2011, subject imports' market share was [[      ]] percent compared to [[      ]]
percent for non-subject imports, and by interim 2012, subject imports' share was [[      ]]
percent," as compared to non-subject imports, whose market share was [[      ]] percent.  Final
Determination at 37–38.

[31]      The ITC found that subject imports experienced growth of [[      ]] percent
between 2009 and 2011, more than doubling the [[      ]] percent growth of U.S. consumption
during this period.  Final Determination at 43.

[32]      The ITC found that subject imports increased their market share by [[      ]]
percent between 2009 and 2011, and that, in interim 2012, their market share was [[      ]]
percent higher than in interim 2011.  Final Determination at 43.  The Commission also found
that, between 2009 and 2011, the domestic industry lost [[      ]] percent of market share and
lost an additional [[      ]] percent of market share between interim 2011 and interim 2012.  Final
Determination at 43.

imports to domestic production grew significantly over the period" and the domestic industry's

net sales quantities even began to fall toward the end of the POI.[33]  Final Determination at 44,

54.  Relatedly, the Commission also found that "a substantial number of domestic producers

shuttered facilities and/or declared bankruptcy" during the POI and "additional producers

continued to fail even after the end of the POI."  *See* Final Determination at 54–55.  In other

words, "[d]espite remarkable demand increases throughout the [POI], the domestic industry's

financial condition was not strong at the beginning of the period and continued to deteriorate

throughout the POI, with the domestic industry incurring operating losses during the entire POI"

and experiencing declining net sales during the latter part of the POI.[34]  *See* Final Determination

at 55.  Thus, the ITC "conclude[d] that the volume [(i.e., supply)] of subject CSPV products

imported into the United States from China [was] significant, absolutely and relative to

consumption [(i.e., consumer demand)] and production in the United States."  Final

Determination at 44.  It reached this conclusion based on its finding that, despite plaintiffs' claim

to the contrary, the domestic industry possessed the capacity during the POI to meet the

---

[33]     The ITC found that the ratio of subject imports to domestic production increased
from [[      ]] percent in 2008 to [[        ]] percent in 2011, and [[          ]] percent in interim
2012.  Final Determination at 44.
        The domestic industry's net sales were [[        ]] megawatts in 2009, [[        ]]
megawatts in 2010, [[      ]] megawatts in 2011, [[        ]] megawatts in interim 2011, and
[[      ]] megawatts in interim 2012.  Final Determination at 54 n.323.  The domestic industry's
average production capacity was [[       ]] megawatts in 2009, [[        ]] megawatts in 2010, [[
      ]] megawatts in 2011, [[        ]] megawatts in interim 2011, and [[        ]] megawatts in
interim 2012.  Final Determination at 54 n.325.

[34]     The domestic industry reported operating losses of [[             ]] in 2009, [[
]] in 2010, [[               ]] in 2011, [[               ]] in interim 2011, and [[
]] in interim 2012.  Final Determination at 55 n.332.  The domestic industry's net
sales were [[          ]] in 2009, [[         ]] in 2010, [[            ]] in 2011, [[
]] in interim 2011, and [[              ]] in interim 2012.  Final Determination
at 55 n.333.

significant increase in demand, and thus determined that, absent subject imports, the domestic

industry would have increased its own sales volume.


### 4. Utility Market

Next, the Commission examined the condition of the utility segment of the U.S. market.

Here, plaintiffs insist that "the domestic industry failed to compete effectively" for utility sales,

where subject imports were the largest supplier, because the domestic industry was unable to

meet the increasingly high demand for CSPV products as a result of other external conditions of

competition that were present in the U.S. market during the POI.  *See* Pls.' Br. 20.  Specifically,

plaintiffs contend that demand for CSPV products grew rapidly during the POI, particularly "in

the utility sector, which . . . is where grid parity and declining incentives had the greatest

impact."  Pls.' Br. 5.  According to plaintiffs, because "subject imports were the predominant

source of CSPV modules in the utility segment," this confirmed that the domestic industry,

which "w[as] not poised to take advantage of the surge in utility sector demand[,] . . . failed to

compete effectively in this segment."  *See* Pls.' Br. 5, 20.

Plaintiffs' claims notwithstanding, the ITC concluded that (1) the domestic industry

possessed the capacity to meet the increased demand that resulted from the significant growth in

the utility sector during the POI and (2) that the special conditions presented in the utility

segment did not account for significant underselling in that segment and did not explain the

domestic industry's injury sustained in the other consumer segments.  The Commission began by

examining the three grid-connected market segments, residential, non-residential, and utility

applications, and found, based on questionnaire data, that, "between January 2009 and June

2011, the largest share of U.S. commercial shipments (up to 45.3 percent) were to commercial

installers, after which time the largest share (42.3 percent) were to utility co-developers."  Final

Determination at 37.  The Commission found that "[t]he share of shipments from all sources to

utility co-developers increased [during the POI] from 5.2 percent in 2009 to 12.3 percent in

2010, and 29.8 percent in 2011, and was 17.6 percent in interim 2011 and 42.3 percent in interim

2012, driven in large part by the availability of incentive programs."  Final Determination at 37.

It also found that, "[a]fter increasing 1,977.4 percent between 2009 and 2011, utilities [were]

projected to account for 54 percent of total installations by the end of 2012."  Final

Determination at 37.  Therefore, as maintained by plaintiffs, the ITC observed that purchases by

the utility sector experienced the most growth of any sector during the POI, growing "from the

smallest segment of the U.S. market in 2009 to the largest by interim 2012."  Final

Determination at 44 n.258.

The Commission further found that "[t]he domestic industry participated in all segments

of the U.S. market (including the residential, non-residential, and utilities segments)" and

"supplied a variety of modules to purchasers in the market," i.e., both lower- and higher-wattage

CSPV modules.  *See* Final Determination at 39.  In addition, it observed that "industry

participants in all market segments purchased CSPV modules of varying types, meaning that

products of particular wattage or cell-type or size were not limited to specific segments of the

U.S. market."  Final Determination at 39–40.  Further, "responding purchasers reported that the

U.S. product was comparable to [the] product made in China for all characteristics except for

price, for which the product from China was rated as superior ([i.e.], lower-priced)."  Final

Determination at 41.

Moreover, as part of its investigations, the Commission collected quarterly net U.S. free

on board[35] selling price data for five CSPV module products[36] during the POI, which it obtained

from eight U.S. producers and twenty-three importers of subject merchandise.  Final

Determination at 46.  Based on the questionnaire responses, the ITC found that the higher-

wattage pricing products (i.e., crystalline silicon module, with a peak power wattage of 260 to

279, and crystalline silicon module, with a peak power wattage of 280 and above) were "not

necessarily sold to the utility segment any more than [the] lower-wattage [pricing] products"

(i.e., crystalline silicon module, with a peak power wattage of 220 to 219, crystalline silicon

module, with a peak power wattage of 220 to 239, and crystalline silicon module, with a peak

power wattage of 240 to 259), which "are necessarily sold to non-utility customers."  Final

Determination at 48.  In other words, higher wattage modules were sold to other market

segments that were not as dominated by subject imports.  Therefore, despite plaintiffs' claim

during the administrative proceeding that the utility segment demanded predominantly higher-

wattage products during the POI and that the domestic industry failed to offer or manufacture

this merchandise during this time period, the ITC found that this was not the case.  Rather, it

---

[35]     "Free on board" "is a standardized shipping term 'mean[ing] that the seller delivers the goods on board the vessel nominated by the buyer at the named port of shipment or procures the goods already so delivered.  The risk of loss of or damage to the goods passes when the goods are on board the vessel, and the buyer bears all costs from that moment onwards.'" *Beijing Tianhai Indus. v. United States*, 39 CIT __, __, 52 F. Supp. 3d 1351, 1356 n.10 (2015) (alteration in original) (quoting *Cutter & Buck, Inc. v. United States*, 37 CIT __, __ n.1, Slip Op. 13-45, at 2 n.1 (2013)).

[36]     The five pricing products were "(1) crystalline silicon module, with a peak power wattage of 220 to 219, inclusive, P-max or Wp," "(2) crystalline silicon module, with a peak power wattage of 220 to 239, inclusive, P-max or Wp," "(3) crystalline silicon module, with a peak power wattage of 240 to 259, inclusive, P-max or Wp," "(4) crystalline silicon module, with a peak power wattage of 260 to 279, inclusive, P-max or Wp," and "(5) crystalline silicon module, with a peak power wattage of 280 and above, P-max or Wp."  Final Determination at 46 n.273.

determined that higher-wattage products were sold frequently by both Chinese exporters and the

domestic industry to not only the utility segment but to the other segments as well.

Moreover, contrary to plaintiffs' assertions, the Commission found that "the[] data

indicate[d that] the domestic industry offered and sold higher-wattage products during the POI."

Final Determination at 47.  The Commission further found that the record showed that imports of

the two higher-wattage pricing products were sold in all market segments.  Final Determination

at 48.  Thus, the Commission determined that there was "a high degree of substitutability

between CSPV products made in the United States and imported from China," and further

"reject[ed] the notion that the pricing data illustrate[d] a lack of competition between subject

imports and the domestic like product in the utility or any other segment of the U.S. market."

Final Determination at 42, 48.

In addition, the ITC found that, "[d]espite numerous closures of U.S. manufacturing

facilities, the domestic industry progressively increased capacity and had available production

capacity throughout the POI, indicating that it was capable of supplying additional demand."

Final Determination at 44.  It thus concluded that, "given the high substitutability between the

domestic like product and subject imports, . . . competition in the U.S. CSPV market primarily

depend[ed] on price."  Final Determination at 45.  In other words, the Commission determined

that the domestic CSPV industry (1) produced the types of CSPV modules that were being

demanded by purchasers in the utility segment, (2) possessed the capacity to meet the growing

demand in this consumer segment, and (3) manufactured CSPV products that were highly

substitutable for subject imports aside from their price.  Therefore, the ITC concluded that the

domestic like product would have possessed the ability to compete effectively with subject

imports in all three consumer segments, including for utility sales, had subject imports not been

sold at dumped prices.

In this connection, the Commission found that "subject imports of both lower- and

higher-wattage products pervasively undersold the domestic like product at wide margins in sales

to all segments of the U.S. market" (i.e., residential, non-residential, and utility).  Final

Determination at 48.  It observed that any growth in shipments of U.S. merchandise to the

utilities sector "pale[d] in comparison to the growth of subject imports," which were the

predominant source of CSPV modules in the utility segment, and that the volume of subject

imports drastically increased in every sector, not just in utilities.  *See* Final Determination at 44

& n.258.  In evaluating the selling price data for the five CSPV module pricing products during

the POI, as reported by U.S. producers and importers of subject merchandise, the Commission

found that "subject imports pervasively undersold the domestic like product at sizeable margins

throughout the POI."  Final Determination at 46.  Specifically, it found that "subject imports

from China undersold the domestic like product in [thirty-five] of [forty-six] possible quarterly

comparisons, or 76.0 percent of the time."[37]  Final Determination at 46.  The Commission thus

concluded that "[t]he record . . . reflect[ed] that domestic producers were forced to lower prices

to compete with low-priced subject imports from China."  Final Determination at 49.

Moreover, it found that "record evidence indicate[d] not only that subject imports

increased their sales to utilities[,] . . . but also that subject imports were able to do so using lower

prices," and "that domestic producers lost sales and revenues due to competition from low-priced

subject imports."  Final Determination at 49.  It thus concluded, based on this evidence, "that

---

[37]      The Commission found that subject imports undersold the domestic like product
76 percent of the time "at margins ranging as high as [[      ]] percent."  Final Determination at
46.

there ha[d] been significant underselling of the domestic like product by subject imports from

China," and that "[t]his underselling enabled subject importers to gain market share at the

expense of the domestic industry."  Final Determination at 49.  In other words, the ITC found

that, as a result of significant underselling and increased volumes of sales of low-priced subject

imports, the domestic industry lost sales in all segments during the POI, not just the utility sector.

A review of this evidence confirms that the Commission reasonably concluded that the

condition of the utility market (i.e., the high demand for CSPV products in this segment during

the POI and the domestic industry's ability to adequately supply the growing demand)

demonstrated that the growth in shipments of subject imports relative to U.S. shipments of the

domestic like product in the utility sector was not the result of other external conditions of

competition in the U.S. market, but rather the result of the low price of the dumped Chinese

product.  Relatedly, the Commission reasonably found that the condition of the utility segment

(i.e., the growth in shipments of subject imports relative to U.S. shipments of the domestic like

product in the utility sector) failed to account for the significant growth of subject imports and

accumulation of market share in other consumer sectors at the expense of the domestic CSPV

industry.  Therefore, the Commission supported with substantial evidence its determination that

the domestic industry possessed the ability to compete for sales in the growing utility segment

during the POI, but was unable to do so because subject merchandise was being offered at

dumped prices.

### 5.   *The Role of Non-subject Imports During the POI*

Next, the Commission reached conclusions after having "closely examined the role of

non-subject imports in these investigations" (i.e., imports of CSPV cells and modules in the U.S.

market from countries other than China).  Final Determination at 57.  It found that "[n]on-subject

sources supplying CSPV cells to the U.S. market included Taiwan, Korea, Japan, and Germany,

and non-subject sources supplying the U.S. market with CSPV modules included Taiwan, Korea,

Mexico, Canada, Singapore, and Japan."  Final Determination at 57.  The ITC further found that,

despite the large volume of subject imports from China during the POI, "non-subject imports

were considerably smaller in magnitude, and their volume declined overall during the POI, both

in absolute and relative terms," and "frequently oversold the domestic like product."[38]  *See* Final

Determination at 57, 58.  Thus, the ITC concluded that, like the domestic industry, non-subject

imports[39] experienced declines in U.S. market share and price underselling by subject imports.

For the Commission and the court, these facts further support the ITC's determination that the

domestic industry was injured "by reason of" subject imports and not "by reason of some" other

external factor, and that the condition of the domestic industry would not, in fact, have been the

same absent the presence of low-priced subject imports from the China in the U.S. market.


### 6.  *Grid Parity*

Last, the Commission considered plaintiffs' grid parity argument.  Plaintiffs insist that,

although the ITC recognized the goal of solar-power producers, and thus producers of CSPV

---

[38]         The ITC found that, "[a]s a share of apparent U.S. consumption, non-subject
imports declined from [[          ]] percent in 2009 to [[          ]] percent in 2010, and [[          ]]
percent in 2011, and were [[          ]] percent in interim 2011 and [[          ]] percent in interim
2012."  Final Determination at 57 n.350.  The ITC further observed that, "[a]s a share of total
imports, imports of non-subject merchandise decreased from 67.7 percent of total imports in
kilowatts in 2009 to 42.9 percent in 2010, and 29.2 percent in 2011, and they were 37.4 percent
in interim 2011 and 41.9 percent in interim 2012."  Final Determination at 57 n.350.

[39]         Indeed, this consideration of non-subject imports satisfied the "but for"
requirement found in *Mittal Steel*, *Bratsk*, and *Gerald Metals*.

products, to attain grid parity (i.e., that taking into account their cost, CSPV products' ability to

generate electricity at a price matching the cost of power produced by other means to supply the

electric grid and thus compete for electricity sales with other electricity-generating sources such

as natural gas), the ITC failed to consider the impact of seeking to attain this goal on the

condition of the domestic CSPV industry during the POI.  According to plaintiffs, the

Commission's analysis was lacking because the ITC failed to observe that the domestic industry

sustained its injury, not as a result of the presence of low-priced subject imports present in the

U.S. market, but rather, "by reason of" the declining cost of other energy-producing technologies

with which it was unable to compete during the POI.  *See* Pls.' Br. 6 ("In the present case,

despite the conditions of competition it found to exist, the Commission erred in failing to

consider the issue of 'but for' causation in its causation, impact, price effects, or volume

inquiries. . . . [S]ubject CSPV imports were merely selling at the prices that the U.S. market

would bear for CSPV products in light of the exogenous forces of grid parity and declining

government incentives.  That is, subject CSPV producers were willing and able to compete with

the rapidly declining [levelized cost of electricity] set by electricity generated from natural gas

during the POI, and therefore they were successful in making sales in the U.S. market.

Meanwhile, domestic CSPV producers were not willing and able to compete with that price, and

that situation would be no different in the absence of subject imports.  In these circumstances, the

Commission could not reasonably have attributed the domestic industry's injury to the subject

imports.  For this reason this Court should reverse the Commission's material injury

determination, including its determinations of causation, impact, price effects, and volume.").

Put another way, plaintiffs' argument is that the domestic industry lost no sales to subject

imports because purchasers, particularly utility purchasers, would have turned to technology that

produced lower-priced electricity (i.e., natural gas), rather than purchase the domestic industry's products.

While plaintiffs assert that the ITC erred by failing to properly take their grid parity arguments into account, the ITC specifically rejected these claims in the Final Determination.  It "recognize[d] the goal for CSPV products to attain grid parity," and went on to explain that "grid parity" is "the point at which the levelized cost of electricity generated from renewable sources [(e.g., solar)] equals the cost of conventional electricity from the grid."  Final Determination at 32, 52.  The "levelized cost of electricity," it stated, is "the sum of all costs over the life of an energy system divided by the quantity of electricity that system would be expected to generate during the period the system is financed."  Final Determination at 32 n.171.  According to the ITC, "[d]uring periods of non-peak electricity demand in the United States, only lowest-cost 'baseload' generators (traditionally coal and nuclear plants) will be able to sell electricity to the grid, whereas during peak electricity demand periods, even generators with somewhat higher costs may be able to sell electricity into the transmission or distribution grid."  Final Determination at 32.

Inexpensive natural gas was indeed affecting the price of electricity.  During "peak periods, natural-gas generated electricity sets the levelized cost of electricity that CSPV solar systems and other renewable systems must seek to meet, especially for sales to the utility segment."  Final Determination at 32.  In other words, buyers will demand the lowest-priced electricity available at any given time.  Thus, CSPV products will be purchased only if the cost of the resulting electricity is price-competitive with the source of electricity that is least expensive during non-peak demand.  As a result, electricity producers using CSPV technology will only be able to sell into the grid so long as they possess the ability to remain price-

competitive with electricity that is generated from other technologies at any given time.  As

noted, here, the Commission found that natural gas-generated electricity set the levelized cost of

electricity, due, in large part, to an increase in the supply of natural gas, which resulted from

fracking and shale drilling, thereby lowering the cost of natural gas.  *See* Final Determination at

32.  Consequently, the grid parity price with which CSPV products competed during the POI fell

as well.

The story, however, does not end there.  The Commission considered record evidence

that included a September 2010 publication from Barclays Capital regarding equity research

related to solar energy.  *See* Pre-Hearing Br. of China Chamber of Commerce for Import and

Export of Machinery and Electronic Products (Volume I of I), Ex. 22 ("Solar Energy

Handbook"), CD 396 at Doc. No. 491422 (Sept. 20, 2012), ECF Dkt. No. 67-2.  This source

explained that there are two different grid parity price points, one at the utility level and one at

the residential level.  Solar Energy Handbook at 56.  The publication noted that the utility price

point was likely to be lower than the residential price point because it was expected that

"residential markets [would] have a much higher solar energy price point due to elimination of

transmission and distribution costs."  *See* Solar Energy Handbook at 56.

As to the utility level, the Commission further relied on evidence indicating that it was

"expect[ed that] grid parity [for solar electricity] at the utility level [would] be reached in the

[United States during the] 2010–12 time frame depending on the development of fossil fuel

generated electricity prices."  Solar Energy Handbook at 56.  This source also indicated "that

solar electricity [was] already competitive with peak power generation capacity in a number of

regions" in the United States, and it observed that, "[i]n the United States, several utilities [had

already] announced deployment of large-scale solar panels beginning" in 2010, which would be

competitive with intermediate and peak load generation capacities.  *See* Solar Energy Handbook

at 56.  Further, the Barclays Capital publication stated that commercial solar energy projects

would generate competitive returns in 2010 in several states.  *See* Solar Energy Handbook at 60.

Moreover, the publication anticipated that, due to favorable federal, state, and local

government legislation and incentive programs in place to stimulate the demand for solar energy

in the United States, and an increased supply of lower-priced solar panels, the United States solar

photovoltaic market would triple between 2011 and 2012 and that solar energy would achieve

grid parity in several states in the year 2011.  *See* Solar Energy Handbook at 125.  Indeed, the

publication stated that "statewide solar programs [were] likely to make the U.S. one of the

fastest-growing markets over the next three to five years."  Solar Energy Handbook at 125.

This evidence thus suggested that plaintiffs' claim, that "domestic CSPV producers were

not willing and able to compete with [the rapidly declining levelized cost of electricity] . . . set

by electricity generated from natural gas during the POI" as compared to "subject CSPV

producers [that] were willing and able to compete with the rapidly declining" cost, was not the

case.  *See* Pls.' Br. 6.  Rather, this record evidence indicated that the domestic industry, in some

parts of the United States, had achieved grid parity during the POI, as a result of favorable

government incentive programs and legislation, and thus, in some cases, was able to compete

with the lower levelized cost of electricity.  In addition, this evidence indicated that, by 2011,

grid parity would be achieved in several states.  Based on this trend, the Commission thus found

that the conditions of grid parity could not explain the injury sustained by the domestic industry,

which was expected to enjoy considerable growth during the POI.  *See* Final Determination at 52

("We further recognize the goal for CSPV products to attain grid parity, which largely means

matching the levelized cost of natural-gas-generated electricity provided to the grid during peak

periods, as discussed above.  Nevertheless, the impetus toward grid parity fails to explain the

significant underselling by subject imports demonstrated on this record.").

Moreover, as part of its analysis, the ITC also relied on the questionnaire responses[40] it

solicited from the domestic industry during the investigations directed at purchasers, producers,

---

[40]      Plaintiffs, in their reply brief, argue that the questionnaire responses solicited by
the ITC are misleading because the questions posed by the Commission were phrased in a way
that failed to distinguish the impact of grid parity from the impact of subject imports.  *See* Pls.'
Reply in Supp. of their Mot. for J. on the Agency R. 14 (ECF Dkt. No. 46) ("Pls.' Reply Br.").
That is, for plaintiffs, the questions posed by the ITC in the questionnaires were not sufficiently
probative of the domestic purchasers' preferences for domestic CSPV products at higher prices
in the absence of subject imports, given the decline in prices of competing conventional energy
sources.  Despite plaintiffs' citation to their initial brief before the court, this argument was, in
fact, raised for the first time in their reply brief.  *See* Pls.' Reply Br. 14 (citing Pls.' Br. 30–33).
It is well-settled that, where, as here, an argument is not raised in a plaintiff's opening brief, it is
waived.  *See Amoco Oil Co. v. United States*, 234 F.3d 1374, 1377 (Fed. Cir. 2000) ("[A] reply
brief should 'reply to the brief of the appellee' and 'is not the appropriate place to raise, for the
first time, an issue for appellate review.' . . . Because these . . .  arguments were not raised in
Amoco's opening brief, we decline to address them." (quoting *Carbino v. West*, 168 F.3d 32, 34
(Fed. Cir. 1999))).  Because plaintiffs failed to raise their argument until their reply brief, it is
deemed waived, and will not be considered by the court.  *See id.*
        The court also finds that this claim was improperly raised by plaintiffs because they
failed to exhaust their administrative remedies.  A court "shall, where appropriate, require the
exhaustion of administrative remedies."  28 U.S.C. § 2637(d); *Yangzhou Bestpak Gifts & Crafts
Co. v. United States*, 716 F.3d 1370, 1381 (Fed. Cir. 2013).  "As a general matter, '[t]he
exhaustion doctrine requires a party to present its claims to the relevant administrative agency for
the agency's consideration before raising these claims to the Court.'"  *Hebei Metals & Minerals
Imp. & Exp. Corp. v. United States*, 28 CIT 1185, 1195 (2004) (alteration in original) (quoting
*Timken Co. v. United States*, 26 CIT 434, 459, 201 F. Supp. 2d 1316, 1340 (2002)).  Generally,
where, as here, a party "fail[s] to present [an] issue during the applicable comment period," it is
"precluded from raising this issue *de novo* before the court."  *AIMCOR v. United States*, 141
F.3d 1098, 1111 (Fed. Cir. 1998) (citations omitted).  Here, during the Commission's
investigations, plaintiffs were given the opportunity to comment on the proposed questions to be
included in the questionnaires prior to being sent to domestic and foreign producers, and
importers and purchasers of CSPV cells and modules.  *See* Comments on Draft Questionnaires,
PD 95 at Doc. No. 483863 (June 26, 2012), ECF Dkt. No. 68-4 ("Comments on Draft
Questionnaires"); Pls.' Br. 9.  Indeed, plaintiffs played an active role in assisting the Commission
in drafting the questions posed in the questionnaires.  *See* Comments on Draft Questionnaires.  If
plaintiffs had concerns regarding the ambiguity or phrasing of certain questions, they could have
raised them with the Commission during the comment period.  Because they failed to do so, and
                                                                    (footnote continued)

and importers of CSPV products.  The ITC found that twenty-one firms reported that price per

watt was the most important factor in making purchasing decisions.  *See* Final Determination at

45.  Twelve of thirteen respondent producers, thirty-seven of forty-five respondent importers,

and thirty-seven of forty-two respondent purchasers indicated that the domestic like product was

either always or frequently interchangeable with imports of subject merchandise.  Final

Determination at 45.  Moreover, the ITC found that "most responding purchasers reported that

CSPV products made in the United States [were] comparable to subject imports from China for

all characteristics except for price, for which the product from China was rated as superior (that

is, lower-priced)."  Final Determination at 45.  Thus, "given the high substitutability between the

domestic like product and subject imports," the ITC found that competition between the two

products depended primarily on price.  Final Determination at 45.

The ITC further found that the "subject imports [substantially] undersold the domestic

like product . . . 76.0 percent of the time, at [high] margins."[41]  Final Determination at 46.  The

ITC determined the effects of this underselling to be significant because survey results of

domestic producers indicated that purchasers of CSPV products "reported initially choosing or

switching to imports from China based on price."  Final Determination at 49.  With respect to

price suppression, the ITC also found that the domestic industry had to lower its prices

---

instead attempt to raise this argument, now, for the first time, the court holds that they failed to
exhaust their administrative remedies.

[41]     These margins, at which the domestic like product was undersold 76 percent of
the time, ranged as high as [[        ]] percent.  Final Determination at 46.

significantly[42] to keep up with the major decline in price of the subject imports.  Final

Determination at 49–50.  Thus, the ITC determined that the large and growing volume of

undersold subject imports depressed and suppressed the domestic prices to a significant degree.

Final Determination at 53.

Relatedly, the Commission observed that, despite the decline in natural gas prices during

the POI, "when asked about the role of conventional energy sources such as natural gas and coal

on changes in demand during the POI, the majority of questionnaire respondents either reported

'no change' in demand for CSPV products related to changes in the price of conventional energy

sources or that CSPV product 'demand increased.'"  Final Determination at 52.  These

questionnaire respondents also reported that the domestic industry lost sales and lowered its

prices in order to compete with low-priced subject imports.  *See* Final Determination at 50.  In

other words, the majority of responding U.S. purchasers of CSPV products confirmed that their

purchasing decisions were not affected by the price of conventionally-produced electricity but

instead by cheap foreign imports.  That is, for a majority of the questionnaire respondents doing

business in CSPV products, the availability of lower-priced alternative energy-producing

technologies, such as natural gas, had no effect on the desirability of solar-producing technology

(i.e., CSPV products).  Thus, based on the input received from the domestic industry participants,

the ITC found that the role of lower natural gas prices and thus grid parity could not explain the

decline in subject import prices in the U.S. market during the POI.  *See* Final Determination at 52

("[T]he impetus toward grid parity fail[ed] to explain the significant underselling by subject

imports demonstrated on this record.").

---

[42]       The ITC found that the domestic industry had to lower its prices by [[        ]]
percent in order to keep up with the [[        ]] percent decline in price of the subject imports.  *See*
Final Determination at 49.

It is apparent that the ITC adequately addressed plaintiffs' primary grid parity argument and found it wanting.  The ITC found that the suppression in domestic CSPV producers' prices and lost sales were not caused by the availability of lower-cost means of electrical production in the marketplace.  Rather, it found that these injurious effects resulted from the presence of low-priced subject imports in the U.S. market.  Hence, the Commission reasonably determined, based on (1) evidence that CSPV products had achieved or would soon achieve grid parity and (2) considerable input received from the domestic industry participants, that the push for grid parity could not explain the underselling and price depression of the domestic like product that occurred during the POI.  This conclusion was supported by substantial evidence and disposes of plaintiffs' primary claim related to their argument that the injury to the domestic industry was caused by unique aspects of the CSPV marketplace.

### 7.  Conclusion

Based on the foregoing discussions of the ITC's methodology and the record evidence, the court holds that the Commission's determination that the injury to the domestic industry was "by reason of" sales of subject merchandise is supported by substantial evidence on the record and is in accordance with law.  Thus, the ITC's injury determination is sustained.

## CONCLUSION

Based on the foregoing, it is hereby

ORDERED that the International Trade Commission's Final Determination is sustained.

Plaintiffs' motion for judgment upon the agency record is denied.  Judgment will be entered

accordingly.

Dated:          August 7, 2015
                New York, New York


                                                        /s/ Richard K. Eaton
                                                        Richard K. Eaton